1  Elwood Lui (SBN 45538)
   elui@jonesday.com
2  Rick L. McKnight (SBN 55183)
   fmcknight@jonesday.com
3  Peter E. Davids (SBN 229339)
   pdavids@jonesday.com
4  JONES DAY
   555 South Flower Street, 50th Floor
5  Los Angeles, California 90071-2300
   Tel:  (213) 489-3939
6  Fax: (213) 243-2539

7  Counsel for Defendant
   BSH HOME APPLIANCES CORPORATION
8

9  **UNITED STATES DISTRICT COURT**

10  **CENTRAL DISTRICT OF CALIFORNIA**

11  **SOUTHERN DIVISION**

12

| | |
|---|---|
| SHARON COBB, et al., individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>     vs.<br><br>BSH HOME APPLIANCES CORPORATION, a Delaware Corporation,<br><br>           Defendant. | Case No. SACV10-711 DOC (ANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT BSH HOME APPLIANCES CORPORATION'S MOTION FOR SANCTIONS**<br><br>Hearing Date: August 18, 2014<br>Time:  8:30 a.m.<br>Place: Courtroom 9D<br><br>*Assigned to:*<br>District Judge:  David O. Carter<br>Courtroom 9D<br><br>Discovery Magistrate Judge:<br>Arthur Nakazato |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ..................................................................................................1

II. FACTS ...................................................................................................................2

    A. Although This Action and the *Whirlpool* Action Share Plaintiffs' Counsel, Theories, and Damages Experts, Plaintiffs' Damages Experts in This Action Take Factually Contradictory Positions to Those They Take in *Whirlpool* ............................................2

    B. Plaintiffs' Damages Experts Take Steps to Conceal the Contradictions ..............................................................................................5

    C. Plaintiffs' Testifying Damages Expert Submits a Report With Material Copied Wholesale From the *Whirlpool* Action .......................6

    D. Plaintiffs' Counsel Refuses to Make a Key Participant in the Scheme Available for Deposition ............................................................8

III. ARGUMENT .........................................................................................................8

    A. The Court Has Inherent Power to Sanction Plaintiffs for Bad-Faith Conduct .........................................................................................8

    B. Plaintiffs' Manipulation of Expert Evidence in an Effort to Mislead Defendant and the Court Warrant an Award of Sanctions ..................................................................................................9

    C. The Amount of Sanctions ....................................................................12

IV. CONCLUSION ....................................................................................................12

# TABLE OF AUTHORITIES

**Page**

**CASES**

*B.K.B. v. Maui Police Dep't,*
   276 F.3d 1091 (9th Cir. 2002) .................................................................. 12

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991) ..................................................................................... 8

*Fink v. Gomez,*
   239 F.3d 989 (9th Cir. 2001) .................................................................. 8, 9

*Lohan v. Perez,*
   924 F. Supp. 2d 447 (E.D.N.Y. 2013) ...................................................... 11

*Marshall v. Hilliard (In re Marshall),*
   No. SACV-01-0097 DOC, 2013 U.S. Dist. LEXIS 76330 (C.D.
   Cal. May 29, 2013) ................................................................................... 11

*Pumphrey v. K.W. Thompson Tool Co.,*
   62 F.3d 1128 (9th Cir. 1995) ..................................................... 8, 9, 10, 11

*Sunrider Corp. v. Bountiful Biotech Corp.,*
   No. SACV 08-1339, 2010 U.S. Dist. LEXIS 117347
   (C.D. Cal. Oct. 8, 2010) ............................................................................. 8

*Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.,*
   549 F.3d 1381 (Fed. Cir. 2008) ................................................................ 12

*Theokary v. Abbatiello (In re Theokary),*
   468 B.R. 729 (Bankr. E.D. Pa. 2012) ....................................................... 11

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.,*
   982 F.2d 363 (9th Cir. 1992) .................................................................... 12

## I. INTRODUCTION

Plaintiffs press a classwide price elevation damages theory premised on a purported "actual" world in which Defendant BSH Home Appliances Corporation ("BSH") charged a higher price for its front-loading washers because they had a propensity for biofilm, mold, and odor issues that BSH did *not* disclose, whereas other front-loading washer manufacturers had those same problems and *did* disclose them, thereby driving consumers to buy BSH washers at a higher price. Later motions will address the many problems with the theory.

This motion focuses on the sanctionable manner in which this theory has been developed. The economists and lawyers in this case designed an economic model based on the contended facts described above while simultaneously advancing the opposite factual scenario in the *Whirlpool* action.[1] Thus, Plaintiffs' lawyers and economists advance opinions that BSH did *not* disclose to purchasers that its washers had biofilm maintenance issues but that Whirlpool *did* disclose these issues, whereas they tell the *Whirlpool* court that BSH *did* disclose the issue to purchasers, but that Whirlpool did *not*.

To mask these contradictory "actual" worlds, Plaintiffs engage in a scheme of deception. The same Analysis Group economists were hired by the Plaintiffs in both the *Whirlpool* case and this case to lead the economic analysis in both cases. But rather than using the same testifying experts, the Plaintiffs instead hired Dr. Marc Rysman as the testifying expert in this action (describing him as a consultant to Analysis Group), and then blocked him from the conflicting information in the *Whirlpool* case.

The artifice of this selective flow of information is highlighted by the fact that Dr. Rysman's expert report copies verbatim, without attribution, crucial passages from the expert report of the Analysis Group economist in *Whirlpool*. The

---

[1] *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-wp-65000 (N.D. Ohio).

report from the *Whirlpool* action was not identified as a document on which Dr. Rysman relied and, at his deposition, he testified incorrectly that he authored the copied sections of his report. The highlighted passages in Exhibit 3 to the McKnight declaration show otherwise.

To dig deeper into these facts, BSH has sought the deposition of Dr. Samuel Weglein of Analysis Group, who has played a primary role in the *Whirlpool* action and in this action and therefore knows firsthand about the copying from another expert's report without disclosing it and the conflicting factual scenarios presented in this action and to the *Whirlpool* court. Plaintiffs have refused to produce Dr. Weglein for his deposition, however, and have responded with threats instead.

In sum, the conduct that is the subject of this motion is unworthy and sanctionable.

## II. FACTS

### A. Although This Action and the *Whirlpool* Action Share Plaintiffs' Counsel, Theories, and Damages Experts, Plaintiffs' Damages Experts in This Action Take Factually Contradictory Positions to Those They Take in *Whirlpool*.

Plaintiffs represented to the Court that this action is just like the *Whirlpool* action. (Mem. (Sealed Dkt. 90) at 13-17 (explaining how "[t]he facts in *Whirlpool* and this case are strikingly analogous"); Reply (Sealed Doc. 146) at 3 ("BSH next argues that its Washers are different from Whirlpool's, but does not explain how. There is nothing unique about BSH Washers when it comes to their propensity to develop [biofilm, mold, and foul odors].").

In addition to sharing the same basic allegations regarding different front-loading washers, this action and the *Whirlpool* action share the same plaintiffs' counsel and same damages experts, Analysis Group. (Ex. 1 [Rysman Dep.] at 7:5-10; Ex. 2 [Van Audenrode Dep.] at 69:11-24.)[2] In the *Whirlpool* action, plaintiffs'

---
[2] All cited exhibits are attached to the concurrently filed Declaration of Rick L. McKnight.

testifying damages expert is Dr. Marc Van Audenrode of Analysis Group, supported by Dr. Samuel Weglein of Analysis Group. (Ex. 2 [Van Audenrode Dep.] at 69:3-7.) In this action, Plaintiffs' testifying damages expert is Dr. Marc Rysman, a consultant to Analysis Group, supported by the very same Dr. Weglein of Analysis Group. (Ex. 1 [Rysman Dep.] at 47:23-48:3.)

In the *Whirlpool* action and in this action, Plaintiffs allege the front-loading washers at issue had a propensity to form biofilm and odors and that class members paid a "premium price" for the washers because purchasers were not informed of required residue maintenance tasks (*e.g.*, keeping the washer door open in between uses, wiping excess moisture from the gasket, running an occasional hot water cycle with bleach). The alleged price premium is measured by a "price elevation" model, which seeks to measure the difference between the price BSH would have charged in the "actual world," assuming BSH did *not* disclose the residue-related maintenance tasks at time of purchase, and a "but for" world in which it did. (Ex. 3 [Rysman Rpt. Comparison], at ¶¶ 35-44.) Plaintiffs' model is based on an "actual world" in which BSH could charge a price premium because BSH did not disclose residue maintenance requirements in a competitive environment in which the other front-loading washer manufacturers, including Whirlpool, did disclose that their machines had biofilm issues and required maintenance. (Ex. 1 [Rysman Dep.] 70:13-23, 126:1-7, 130:1-23.)

The "actual" world model is not based on "real" world facts or any investigation, but solely on an attorney-directed assumption. (Ex. 1 [Rysman Dep.] at 74:14-75:20, 84:23-85:5, 92:20-93:5, 119:16-22, 133:13-134:10, 137:25-138:14.) To try to prove price elevation damages in *Whirlpool*, by contrast, the plaintiffs' same Analysis Group experts modeled their analysis on the fact in the "actual" world that Whirlpool did *not* disclose its washers' residue maintenance tasks but its competitors, including BSH, *did*. (Ex. 2 [Van Audenrode Dep.] 10:7-12:1, 483:8-12.) Thus, in modeling economic damages, Analysis Group relied on diametrically

- 3 -                     BSH'S MEMO ISO MOT. FOR SANCTIONS
                          Case No. SACV10-711 DOC (ANx)

1  opposite "facts" about competition in the market for front-loading washing
2  machines and advanced half of those conflicting facts in their expert report in this
3  action while simultaneously advancing the other half to the *Whirlpool* court.

4      The incentive to take these contradictory factual positions for purposes of
5  damages was acknowledged by Analysis Group in the *Whirlpool* action: Dr. Van
6  Audenrode conceded that "if it is the case that all manufacturers sold defective
7  washing machines and had not adequately disclosed biofilm-related maintenance,
8  then [his] estimate of price elevation would fall to zero." (Ex. 4 [Van Audenrode
9  Reply Rpt.] at 34.) In other words, there would be no price elevation damages if no
10 manufactures disclosed residue-related maintenance prior to purchase.

11     The obvious should be noted. To model the "actual world" requires
12 establishing the real world facts about competition. Those facts cannot be assumed.
13 Economists regularly can and do assume a fact that the jury will determine, such as
14 liability, but the jury cannot and does not determine competitive behavior in the
15 "actual world" based on a lawyer-directed assumption.

16     Another key fact in the damages calculation is what consumers knew about
17 residue maintenance requirements. In this action, Analysis Group and Dr. Rysman
18 contend that purchasers of front-loading washers from all of BSH's competitors
19 knew of the residue maintenance requirements (Ex. 1 [Rysman Dep.] at 130:1-8), a
20 position that Dr. Weglein knew was exactly contrary to the position being taken by
21 Analysis Group in the *Whirlpool* case (*id.* at 130:19-23). Indeed, Dr. Weglein sat
22 next to Dr. Van Audenrode at his deposition in *Whirlpool*, where he testified:
23 "Q. And your assumption was that in the real world no consumers of Whirlpool
24 front-loading washing machines knew the [residue maintenance] steps that would
25 be required; correct? A. That's correct." (Ex. 2 [Van Audenrode Dep.] at 11:22-
26 12:1.) Dr. Weglein, Analysis Group, and Dr. Rysman also assume that purchasers
27 of BSH washers "knew basically nothing about any front load washing machine
28 requirements for residue-related maintenance," a position contrary to the one taken

in *Whirlpool*. (Ex. 1 [Rysman Dep.] at 139:2-12; Ex. 2 [Van Audenrode Dep.] at 483:8-12.)

### B. Plaintiffs' Damages Experts Take Steps to Conceal the Contradictions.

Apparently to conceal the fact that their expert in this matter uses a damages model based on facts that directly contradict the facts the plaintiffs' expert relied upon in *Whirlpool*, Analysis Group kept the same nontestifying expert in place but switched out the testifying expert. Whereas Dr. Van Audenrode was Analysis Group's testifying expert in the *Whirlpool* action, Analysis Group retained Dr. Rysman to be its "consultant" to testify in the BSH case. (Ex. 1 [Rysman Dep.] at 7:8-10.)

Although the identity of the testifying expert changed, the supporting experts remained constant. Dr. Weglein provided primary support to Dr. Van Audenrode in the *Whirlpool* action and sat in support of Dr. Van Audenrode's deposition in that case. (*Id.* at 21:6-15; Ex. 2 [Van Audenrode Dep.] at 2:17, 5:12-13, 69:3-5, 70:15-21). Together with a colleague, Dr. Weglein also provided the lead support for Dr. Rysman in this action and sat in support of Dr. Rysman's deposition. (Ex. 1 [Rysman Dep.] at 2:22, 4:10-19; 47:23-48:3.) Dr. Weglein and his colleagues at Analysis Group charged many hundreds of hours to develop Dr. Rysman's opinion and report in contrast to the mere 23 hours Dr. Rysman himself reported. (*E.g.*, *id.* at 36:10-37:19, 45:13-25.)

Dr. Rysman's wholesale reliance on Dr. Weglein and the *Whirlpool* price elevation analysis (altered to suit Plaintiffs' needs in this action) was revealed at Dr. Rysman's deposition. Dr. Rysman testified for over an hour about his price elevation damages theory but even he could not keep the conflicting facts straight in his head. Thus, he repeatedly asserted that his model rests on competitors' front-loading washers not having any residue maintenance requirements. (Ex. 1 [Rysman Dep.] at 68:5-24; 74:14-77:10, 84:4-85:5, 89:4-15, 91:5-16, 93:20-94:19.) Then,

after a lunch break with Dr. Weglein, Dr. Rysman did an about-face and stated that his earlier testimony was mistaken. (*Id.* at 121:16-125:24.) In fact, he now claimed, the price elevation model was based on other front-loading washer brands having residue maintenance requirements and disclosing them fully prior to sale. (*Id.*)

Given his central roles in the two actions, Dr. Weglein knew of the conflicting models of the supposed "actual worlds" in which the challenged behavior occurred. Dr. Weglein provided primary support for Dr. Rysman's report and opinion, but on the central damages contentions of (i) whether Whirlpool disclosed to consumers its washers' residue maintenance requirements, (ii) whether those consumers knew of the residue maintenance requirements, and (iii) whether Whirlpool's competitor BSH did not disclose to consumers, Dr. Weglein remained silent about the facts relied on in the *Whirlpool* action and Dr. Rysman did not ask him. (Ex. 1 [Rysman Dep.] at 133:9-22.) Dr. Rysman was essentially walled off from investigating these conflicting damages models and did not discuss them with Dr. Weglein or anyone at Analysis Group. (*Id.* at 20:8-19, 25:25-26:1.)

### C. Plaintiffs' Testifying Damages Expert Submits a Report With Material Copied Wholesale From the *Whirlpool* Action.

Compounding the unconscionable scheme of Analysis Group advancing to the courts directly conflicting damages models and contended facts and obscuring the scheme by damming the flow of information to Dr. Rysman, significant parts of Dr. Rysman's report were copied without attribution from the prior report of Dr. Van Audenrode in *Whirlpool*. Those copied portions are at the core of Plaintiffs' damages theory. Attached as Exhibit 3 to the McKnight declaration is a copy of a portion of Dr. Rysman's expert report with material copied directly from Dr. Van Audenrode's expert report highlighted in yellow. This exhibit contains a mere portion of the copied material, but it directly focuses on the "price elevation" damages theory.

1   Additionally, Dr. Rysman testified inaccurately about his expert report's
2   authorship and about the materials on which he relied. At his deposition,
3   Dr. Rysman testified that Plaintiffs' "price elevation" damages theory was the
4   "methodology that [he] devised." (Ex. 1 [Rysman Dep.] at 28:11-13.) As to the
5   price methodology section of his report (section V.A), Dr. Rysman testified as
6   follows: "Q. You ultimately wrote these words in this report, with perhaps some
7   assistance from Analysis Group? A. Yes. Q. Is that correct? A. Yes." (*Id.* at
8   34:23-35:3.) A comparison of Dr. Rysman's report to Dr. Audenrode's report in
9   *Whirlpool* reveals, however, that the price methodology section of Dr. Rysman's
10  report was lifted wholesale, and without attribution, from Dr. Van Audenrode's
11  Report. (Ex. 3.) Dr. Rysman testified under oath as to this section that, "[s]ome of
12  the lines I wrote and some of the lines [Analysis Group] wrote first," but that he
13  changed the lines Analysis Group wrote first. (Ex. 1 [Rysman Dep.] at 34:15-19.)
14  A review of the copied language shows this testimony to be seriously wrong: the
15  primary change from Dr. Van Audenrode's report is that "Whirlpool" is changed to
16  "Bosch." (Ex. 3.)

17  Not only does Dr. Rysman's report contain material lifted directly from
18  Dr. Van Audenrode's report, but Dr. Rysman apparently aided the Analysis Group
19  in trying to cover it up. Dr. Rysman testified, "I did not look at any of the analysis
20  from the Whirlpool case." (Ex. 1 [Rysman Dep.] 25:25-26:1; *see also id.* at 26:2-
21  11.) Dr. Rysman's report did not disclose either of Dr. Van Audenrode's reports as
22  materials relied on in reaching his opinions. (Ex. 5.) Yet at his deposition, Dr.
23  Rysman was quite clear: the list of materials he relied on was "a complete list" that
24  included "the documents that Analysis Group relied upon." (Ex. 1 [Rysman Dep.]
25  at 17:16-18:5.) Dr. Rysman denied ever seeing Dr. Van Audenrode's expert report
26  and stated "[i]t never came up." (*Id.* at 25:2-7.)

27  In sum, Dr. Rysman testified that he was not aware of Dr. Van Audenrode,
28  did not know that he was the testifying damages witness in the *Whirlpool* case, had

never met him, did not talk to him, and made no effort to find out who at Analysis Group was working on the *Whirlpool* case. (Ex. 1 [Rysman Dep.] at 19:5-20:19.) This even though a simple comparison discloses Dr. Van Audenrode is the author of significant parts of Dr. Rysman's expert report in this case. Dr. Rysman did, however, know that Dr. Weglein was co-lead on this case and also worked on the *Whirlpool* action. (*Id.* at 21:6-15, 47:23-48:3.)

### D. Plaintiffs' Counsel Refuses to Make a Key Participant in the Scheme Available for Deposition.

BSH has requested that Plaintiffs make Dr. Weglein available for deposition to question him about the matters described above, but Plaintiffs have refused, asserting that BSH's accusations are "patently and entirely false" and have threatened that, if the effort to seek Dr. Weglein's testimony continued, Plaintiffs will insist on reviewing expert reports "where Jones Day has represented a plaintiff in intellectual property cases against multiple defendants." (McKnight Decl. ¶ 7.)

## III. ARGUMENT

### A. The Court Has Inherent Power to Sanction Plaintiffs for Bad-Faith Conduct.

The Court has the inherent power to sanction bad faith conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42-47 (1991); *Fink v. Gomez,* 239 F.3d 989, 992 (9th Cir. 2001) ("the district court has the inherent authority to impose sanctions for bad faith, which includes a broad range of willful improper conduct"). This inherent power may be invoked to assess sanctions where a fraud has been perpetrated upon the Court. *Chambers*, 501 U.S. at 46. Fraud upon the Court may also consist of "an unconscionable plan or scheme which is designed to improperly influence the court in its decision." *Pumphrey v. K.W. Thompson Tool Co*., 62 F.3d 1128, 1131 (9th Cir. 1995). And "[a] court may impose sanctions under its inherent power for bad faith displayed either toward an adversary or the court." *Sunrider Corp. v.*

*Bountiful Biotech Corp.*, No. SACV 08-1339 DOC (AJWx), 2010 U.S. Dist. LEXIS 117347, at *80 (C.D. Cal. Oct. 8, 2010).  For example, sanctions are warranted in response to "reckless misstatements of law and fact . . . coupled with an improper purpose, such as *an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case.*"  *Fink*, 239 F.3d at 994 (emphasis added).

### B. Plaintiffs' Manipulation of Expert Evidence in an Effort to Mislead Defendant and the Court Warrant an Award of Sanctions.

The conduct of Plaintiffs' experts Analysis Group and apparently Dr. Rysman—all of which was overseen by the same Plaintiffs' counsel in the *Whirlpool* action and this action—qualifies as "an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  *Pumphrey*, 62 F.3d at 1131.

As described in the fact section above, not only has Analysis Group, led by Dr. Weglein, taken factually irreconcilable positions, they have taken various steps to conceal the contradiction.  Rather than using Dr. Van Audenrode in this action, where he would have to explain the factual contradiction, Analysis Group retained Dr. Rysman as a "consultant" testifying expert.  Dr. Weglein, who worked on Dr. Van Audenrode's report, did not provide Dr. Rysman with any materials from the *Whirlpool* action, which would have given Dr. Rysman knowledge of the blatant contradiction.  Analysis Group then took large portions of Dr. Van Audenrode's reports from the *Whirlpool* case, replaced "BSH" for "Whirlpool" as the only front-loading washer manufacturer that purportedly did not disclose its washers' residue maintenance requirements, and passed off the work as Dr. Rysman's.  Despite the wholesale copying, neither Analysis Group nor Dr. Rysman disclosed Dr. Van Audenrode's report as something Dr. Rysman replied on in reaching "his" opinions.  And Dr. Rysman himself testified inaccurately under oath about his authorship of

key sections of his report. And to keep the facts masked, Plaintiffs have steadfastly refused to make Dr. Weglein available for deposition to answer questions about the scheme.

      The circumstances here are analogous to those in *Pumphrey*, where the Ninth Circuit considered similar facts to be a fraud upon the court. There, a gun company was sued for wrongful death by the widow and children of a man who died when a gun defendant had manufactured fired after the decedent dropped it. *Pumphrey*, 62 F.3d at 1130. At trial, defense counsel introduced a videotape that purportedly demonstrated how the safety devices on the gun that caused decedent's death would, if used properly, prevent the gun from firing. *Id*. The jury found the decedent 80% contributorily negligent. *Id*. Meanwhile, the gun manufacturer was defending another suit arising out of injuries sustained when the same type of gun was dropped, and it produced in discovery another video showing the opposite results: the gun fired when it was dropped, despite proper use of the safety devices. *Id*. Defendant had never disclosed the existence of the damaging video in the first wrongful death suit. *Id*. Moreover, the defendant's expert witness "testified several times in [the first action] that he had conducted drop-tests of [the gun] but it had never fired." *Id*.

      The Ninth Circuit noted that the defendant's general counsel was well aware of the existence of the damaging video, and attended the trial where an expert testified on the company's behalf "without qualification, that he had never seen the [gun] fire when dropped during tests." *Id*. at 1132.[3] It then affirmed the District Court's holding that a "fraud upon the court" had been perpetrated by the general counsel, because defendant had "engaged in a scheme to defraud the jury, the court, and [the plaintiff], through . . . presentation of fraudulent evidence, and the failure

---

[3] *Pumphrey* also held that the general counsel and vice president of the defendant gun company was an officer of the court based on his significant participation in the litigation, even though he did not represent the defendant. *Id*. at 1131.

- 10 -

BSH'S MEMO ISO MOT. FOR SANCTIONS
Case No. SACV10-711 DOC (ANx)

to correct the false impression created by [expert] testimony." *Id.* In the context of a motion to set aside the judgment, *Pumphrey* squarely held that concealment of adverse evidence and manipulation of expert testimony constitutes a "fraud on the court." *Id.*

Here, as in *Pumphrey*, the decision of Plaintiffs' counsel to sponsor Dr. Rysman's report, which is based on conflicting facts contradicted completely by their simultaneous submission in another pending case constitutes a fraud upon the court and, as such, sanctions are warranted. *See Marshall v. Hilliard (In re Marshall)*, No. SACV-01-0097 DOC; SACV-99-1372 DOC, 2013 U.S. Dist. LEXIS 76330, at *23 (C.D. Cal. May 29, 2013) (imposing sanctions because of "fraud upon the court" and citing *Pumphrey* standard). Plaintiffs and their attorneys together with Analysis Group and Dr. Weglein manipulated expert testimony for the purpose of creating price elevation damages in this action and then tried to conceal the adverse evidence of Dr. Van Audenrode's wholly contradictory price elevation model in the *Whirlpool* action. Further, Plaintiffs have hindered the investigation of the scheme, refusing to make Dr. Weglein available for deposition to face questions about the scheme. (McKnight Decl. ¶ 7.)

Even apart from the broader unconscionable scheme, copying of an expert report without attribution, and hiding the act, serves as a proper basis for an award of sanctions pursuant to the Court's inherent power. *Theokary v. Abbatiello (In re Theokary)*, 468 B.R. 729, 749 (Bankr. E.D. Pa. 2012) (awarding sanctions because of a "fraud on the court" that occurred when "the Debtor knowingly manufactured and presented false evidence to the court. He knew that [the expert witness] was neither the primary source of the [expert report] nor the author of the 2 Reports."). Indeed, the "victim" of such copying has been held to be "the justice system itself," and such conduct is therefore sanctionable under the Court's inherent power. *Lohan v. Perez*, 924 F. Supp. 2d 447, 461 (E.D.N.Y. 2013) (imposing fine payable to the Court upon attorney who copied a pleading).

### C. The Amount of Sanctions

The Ninth Circuit has recognized the broad range of remedies a court may fashion in imposing sanctions pursuant to its inherent powers. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1108 (9th Cir. 2002). Accordingly, courts have assessed sanctions in the form of attorney's fees and even compensatory damages to the opposing party. *B.K.B.*, 276 F.3d at 1108-09. Courts have not hesitated to exclude witnesses and evidence pursuant to the inherent power to sanction a party for bad faith conduct. *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992). Expert fees may also be awarded. *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1391 (Fed. Cir. 2008) ("a district court may invoke its inherent power to impose sanctions in the form of reasonable expert fees in excess of what is provided for by statute").

BSH respectfully submits that an appropriate award of sanctions, at minimum, would be to require Plaintiffs to reimburse BSH for half of the reasonable attorneys' fees and costs it incurred in preparing for and taking Dr. Rysman's deposition and for reasonable expenses incurred in any deposition of Dr. Weglein. This will start to compensate BSH for the expenses it incurred in uncovering the unconscionable scheme.

### IV. CONCLUSION

It is respectfully submitted that the motion for sanctions should be granted.

Dated: July 21, 2014                          JONES DAY

                                              By: /S/ Rick L. McKnight
                                                  Rick L. McKnight

                                              Attorneys for Defendant
                                              BSH HOME APPLIANCES
                                              CORPORATION

LAI-3219326