O
JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| DIANA TAIT, ET AL., <br>     **Plaintiffs,** <br><br><br>     **vs.** <br><br> **BSH HOME APPLIANCES CORPORATION,** <br>     **Defendants.** | **Case No.: SACV 10-0711-DOC (ANx)** <br><br> **ORDER GRANTING PLAINTIFFS' MOTION FOR ATTORNEY'S FEES AND REIMBURSEMENT OF EXPENSES, AND PLAINTIFFS' REQUEST FOR SERVICE AWARDS [372]; GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT [373]** |

Before the Court is Plaintiffs' Motion for Attorney's Fees and Reimbursement of Expenses, and Plaintiffs' Request for Service Awards ("Motion for Fees") (Dkt. 372) and Plaintiffs' Motion for Final Approval of Class Action Settlement ("Motion for Final Approval") (Dkt. 373). The Court held a hearing on this matter on June 8, 2015. Defendant did not file an opposition to the two motions. The Court received a number of objections to the proposed settlement. After reviewing the moving papers, considering the arguments at the hearing, and reviewing the entirety of the record, the Court GRANTS the Motion for Fees and the Court GRANTS the Motion for Final Approval.

# I.   Background

## A. Procedural History

On June 3, 2010, Plaintiffs Diana Tait and Nancy Wentworth filed a Complaint against Defendant BSH Home Appliances Corporation ("BSH") alleging that certain BSH washing machines have a propensity to develop a filmy substance referred to as "Biofilm," bacteria, mold, fungus, and bioorganic material which produce foul odors (Dkt. 1). On February 14, 2011, Plaintiffs Sharon Cobb, Beverly Gibson, Trish Isabella, Diana Tait and Nancy Wentworth filed the Consolidated Amended Complaint ("CAC") (Dkt. 41). BSH moved to dismiss the CAC (Dkt. 43). In the meantime, the consolidated action was transferred from Judge Cormac J. Carney to this Court (Dkt. 58). The Court granted BSH's motion to dismiss with leave to amend (Dkt. 60), and Plaintiffs filed a Second Consolidated Amended Complaint ("SCAC") (Dkt. 66). BSH renewed its motion to dismiss (Dkt. 67), which the Court granted in part, and denied in part (Dkt. 74). BSH answered the SCAC on September 21, 2011 (Dkt. 75).

Plaintiffs moved for certification of four individual state classes comprised of purchasers of BSH washers in California, Illinois, Maryland, and New York, respectively (Dkt. 87). BSH opposed the certification motion and moved to strike Plaintiffs' experts' opinions (Dkts. 96-102, 103-104). On December 20, 2012, the Court certified four state classes and denied BSH's motion to exclude the opinions of Plaintiffs' engineering and biology experts (Dkt. 166). *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466 (C.D. Cal. 2012).

BSH petitioned the Ninth Circuit for permission to appeal the class certification order on January 3, 2013. At the same time, petitions for certiorari were pending in similar moldy washer cases against Whirlpool Corporation ("*Whirlpool*") and Sears, Roebuck & Co. ("*Kenmore*") challenging class certification decisions by the Sixth and Seventh Circuits. On April 1, 2013, the Supreme Court granted certiorari in both *Whirlpool* and *Kenmore*, vacated the respective circuit opinions, and remanded for reconsideration in light of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ("GVR Orders"). The same day, the Ninth Circuit denied BSH's petition for review. BSH filed a motion for reconsideration, which the Ninth Circuit denied. Following the GVR Orders, the Sixth and Seventh Circuits reaffirmed their earlier

decisions, and Whirlpool and Sears once again petitioned for certiorari. Earlier, on July 30, 2013, BSH filed its own petition for a writ of certiorari from the Ninth Circuit's denial of permission to appeal. The petitions for all three cases were denied on February 24, 2014.

Plaintiffs' claims against BSH are on behalf of all United States residents who purchased one or more Bosch or Siemens brand 27-inch front-loading washing machines. Provisional Fourth Amended Complaint (Dkt. 370) ¶ 2.[1] Plaintiffs allege that BSH designed, manufactured, marketed, and sold washers with a propensity to develop bacteria, mold and foul odors ("BMFO"), and that BSH failed to disclose this defect or the extraordinary tasks required to abate or ameliorate BMFO. *Id*. ¶¶ 4-7, 44-45. Plaintiffs brought claims against BSH for violations of state consumer protection statutes, common law fraudulent concealment and nondisclosure, breach of express and implied warranties, and unjust enrichment. *Id*. ¶¶ 98-207.

BSH filed a motion for sanctions related to Plaintiffs' damages experts (Dkt. 232), which the Court denied on August 20, 2014 (Dkt. 252). Plaintiffs filed a motion for spoliation sanctions related to discovery issues (Dkt. 265), which was also denied (Dkt. 284).

On August 25, 2014, the Court approved Plaintiffs' proposed Notice Plan and draft forms of notice to the Class (Dkt. 258). Class notice was disseminated to California, Illinois, Maryland, and New York class members beginning in late September.

On August 29, 2014, BSH filed a motion for partial summary judgment (Dkt. 259). Ten days later, BSH filed a motion to decertify the classes (Dkt. 276). The parties also filed cross-motions to exclude the opinions of each other's experts ("*Daubert* motions") (Dkts. 289, 335). At the time of settlement, the partial summary judgment and decertification motions had been fully briefed and were awaiting hearing and final rulings, and reply briefs for the *Daubert* motions were days from being filed.

Discovery in this matter may fairly be described as extensive and contentious. Plaintiffs served multiple sets of document requests, interrogatories, and requests for admissions.

---

[1] Plaintiffs originally alleged claims related to 24-inch washing machines, too, but those claims were not certified, are not included in the settlement, and will not be released. The operative Fourth Amended Consolidated Complaint clarifies that the Class includes only purchasers of the 27-inch machines.

Declaration of Kristen Law Sagafi ("Sagafi Decl.") (Dkt. 373-1) ¶ 8. BSH produced tens of thousands of pages of documents, including detailed consumer complaint records and internal correspondence regarding the design and marketing of the washers. *Id*. The parties took and defended 28 fact witness depositions, including of BSH marketing, engineering, and consumer complaint employees and former employees. These depositions took place across the United States and in the Netherlands. *Id*. The named Plaintiffs were also deposed. *Id*. ¶ 22.

The parties presented, collectively, 21 experts who together prepared and served 32 expert reports, including eight disclosed during the class certification stage. The experts prepared reports related to the washers' allegedly defective design, mold growth and testing, consumer complaints, consumer perception of BSH's marketing and alleged non-disclosures, and damages. *Id*. ¶ 9. The parties took and defended a total of 26 expert depositions, with some of the experts being deposed both at the class certification and the merits phases. *Id*.

### B. Settlement Negotiations

The parties attended mediation on December 8, 2013, with the Honorable Daniel S. Pratt (Ret.) serving as mediator. At that time, this case and similar cases against other manufacturers of front-loading washing machines were facing the possibility of Supreme Court review. The case did not settle. Sagafi Decl. ¶ 12.

Pursuant to the Court's Scheduling Order dated June 30, 2014, the parties participated in mediation again, this time with the Honorable Dickran Tevrizian (Ret.), on September 8, 2014. The parties reached agreement on some significant issues, but did not reach full agreement on all terms. *Id*. ¶ 13.

Following the second mediation, the parties resumed active litigation, including continued expert work and briefing on BSH's motion for summary judgment, BSH's motion to decertify the class, and *Daubert* motions, along with trial preparation. *Id*. ¶¶ 13-14. On October 21, 2014, the parties resumed negotiations without the assistance of the mediator. The parties reached agreement on the outstanding issues and executed a memorandum of understanding ("MOU") on November 3, 2014. The parties negotiated the amount of attorney's fees and costs and service awards for the class representatives only after completing negotiation of the

substantive settlement terms. *Id*. ¶ 14; Declaration of Dickran Tevrizian ("Tevrizian Decl.") (Dkt. 386) ¶ 7.

Following the MOU, there were further negotiations over the specifics of the claims process and the notice program, including consultation with the claims administrator, KCC. In parallel with these efforts, class counsel worked diligently to prepare the preliminary approval motion. Sagafi Decl. ¶ 18. On December 12, 2014, the parties fully executed the Settlement Agreement, and that same day, class counsel moved for preliminary approval (Dkt. 363).

On December 29, 2014, the Court granted Plaintiffs' Unopposed Motion for Preliminary Approval (Dkt. 368), preliminarily finding the Settlement to be "fair, reasonable, and adequate," and "direct[ing] the Claims Administrator and the parties to carry out the Notice Plan as provided for in the Settlement."

### C. Key Terms of the Settlement

The settlement class consists of all residents of the United States who were the original purchasers of one or more Bosch or Siemens brand 27-inch front-loading washers (with certain exclusions). Settlement Agreement (Dkt. 363-1) at 7, § II.G.

The settlement is a "claims-made" settlement. Each member of the class is eligible for a $55 cash payment from BSH. *Id*. § III.A. In order to receive the payment, class members for whom BSH had proof of ownership through its warranty records needed only to confirm their correct mailing addresses and submit a statement under penalty of perjury that they were the original purchaser. Other class members needed to provide proof of ownership through other means (such as a receipt, invoice, credit card statement, or picture of their washer's serial number) along with a statement under penalty of perjury that they were the original purchaser of the washer. Class members had until May 28, 2015, to submit a claim.

BSH agreed not to oppose a request by class counsel for attorney's fees and costs of $6.5 million, including expert fees and costs. *Id*. at 15, § VI.

The settlement provides for a release of liability that will preclude future claims "arising out of, or in any way relating to any act, failure to act, omission, misrepresentation, fact, event, transaction, or occurrence from the beginning of time until the Effective Date of this Settlement

Agreement that were raised or could have been raised in the Action relating in any way to BMFO in the Washers (including the Nationwide Claims), except for claims for personal injury, emotional distress, or wrongful death." *Id.* at 17, § VIII.B.

Notice of the settlement was provided by mail or email to over 140,000 out of an estimated 650,000 class members. Notice was also provided through the Internet, including by the use of Internet banner ads and a settlement website, which is linked to by class counsel's websites. Declaration of Eric Robin ("Robin Decl.") (Dkt. 373-2) ¶ 14; Sagafi Decl. ¶ 19. Notice was also published in the *Orange County Register* and *People* and *National Geographic* magazines. Robin Decl. ¶ 11.

## II.    Legal Standard

### A.    Settlement Approval

"The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval involves a two-step process: (1) preliminary approval of the settlement; and (2) following a notice period to the class, final approval of the settlement at a fairness hearing. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). The Court may issue final approval of a class settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Once the court certifies a settlement class, approval of the settlement terms rests in the court's sound discretion. *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

"A difficult balancing act almost always confronts a district court tasked with approving a class action settlement." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). On the one hand, "there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). "But on the other hand, 'settlement class actions present unique due process concerns for absent class members,' and the district court has a fiduciary duty to look after the interests of those absent class members." *Allen*, 787 F.3d at 1223 (internal citations omitted).

Upon appellate review, approval of a settlement's substantive fairness will rarely be overturned "unless the terms of the agreement contain convincing indications that . . . self-interest rather than the class's interests in fact influenced the outcome of the negotiations." *Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003). However, district courts in the Ninth Circuit are held "to a higher *procedural* standard when making that determination of substantive fairness." *Allen*, 787 F.3d at 1223. "To survive appellate review, the district court must show it has explored comprehensively all factors, and must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citations and internal quotation marks omitted).

In considering final approval of a proposed settlement, the Court's discretion is guided by the following factors:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 556, 575 (9th Cir. 2004). "This list is not exhaustive, and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). In addition to these factors, the Court may consider the procedure by which the parties arrived at the settlement to determine whether the settlement is truly the product of arm's length bargaining, rather than the product of collusion or fraud. *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 851 (N.D. Cal. 2010).

The Court's role in evaluating the proposed settlement "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (internal quotation marks omitted).

In general, there is a strong judicial policy favoring class settlements. *Class Plaintiffs*, 955 F.2d at 1276. In evaluating a settlement agreement, it is not the Court's role to second-guess the agreement's terms. *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). If the settlement cannot be approved as is, the Court must reject the settlement because it is not authorized "to delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (internal quotation marks omitted).

## B.    Attorney's Fees and Costs

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[C]ourts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941. "The reasonableness of a fee award must be considered against the backdrop of the 'American Rule,' which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless" an exception applies. *Id.* "The award of attorneys' fees in a class action settlement is often justified by the common fund or statutory fee-shifting exceptions to the American Rule, and sometimes both." *Id.*

"An award of attorneys' fees incurred in a suit based on state substantive law is generally governed by state law." *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1024 (9th Cir. 2003). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Farmers Ins. Exch. v. Law Offices of Conrado Joe Sayas, Jr.*, 250 F.3d 1234, 1236 (9th Cir. 2001) (internal quotation marks omitted); *see also Winterrowd v. Am. Gen. Annuity Ins. Co.*, 556 F.3d 815, 827 (9th Cir. 2009) ("State law establishes the required showing for attorney's fees in an action in diversity.").

## C.    Representative Enhancement

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." *Staton*, 327 F.3d at 977. It is within

the Court's discretion to grant such an award. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). These awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general. Awards are generally sought after a settlement or verdict has been achieved." *Rodriguez*, 563 F.3d at 958-59.

## III.   The Court's Special Obligation

The proposed settlement contains certain features which the Court finds troubling.

As the Court indicated at the Fairness Hearing, it takes seriously its obligation to independently ensure that the settlement—including the requested attorney's fees—is fair, reasonable, and adequate. This duty compels the Court to "look for 'subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations.'" *Allen*, 787 F.3d at 1224. In *Allen*, the Ninth Circuit reiterated three such subtle signs: "(1) 'when counsel receive a disproportionate distribution of the settlement;' (2) 'when the parties negotiate a "clear sailing" arrangement' (i.e., an arrangement where defendant will not object to a certain fee request by class counsel); and (3) when the parties create a reverter that returns unclaimed fees to the defendant." *Id.* (quoting *In re Bluetooth*, 654 F.3d at 947). The Court is concerned that each of these factors appears to be present in the proposed settlement.

The proposed settlement is a "claims-made" settlement, which "is a settlement that does not have a fixed settlement fund, but rather provides that the defendant will pay claims of class members who file them, usually up to some fixed ceiling." 4 William B. Rubenstein et al., *Newberg on Class Actions* ("*Newberg*") § 13:7 (5th ed.). As to proportionality, courts are split on whether, in claims-made settlements, attorney's fees should be viewed as a percentage of the total amount available to the class or the smaller amount actually claimed by the class. *See id.* (citing cases). Class counsel argue that fees should be viewed as a percentage of the maximum amount of funds potentially available to the class. They argue that the requested award of $4,188,981.61 is only 10% of the total "maximum value" of the settlement, which they assert is

$42.25 million—that is, $35,750,000 ($55 per class member × 650,000 class members) + $6,500,000 ($4,188,981.61 in fees + $2,311,018.39 in costs). The Court does not agree.

The problem with class counsel's comparison is that it distorts the reality of the *actual* payment that BSH will make to the class. *Allen* supports the view that proportionality should be determined with reference to the actual amount paid to the class. In *Allen*, the settlement created a maximum fund of $4.5 million and class counsel sought, and was awarded, a fee representing 25% of that amount. *Allen*, 787 F.3d at 1221. However, less than 8% of the class submitted timely claims and thus only a maximum of $373,675 would be disbursed to the class. *Id.* at 1224 n.4. In reversing, the Ninth Circuit expressed its concern that the fee award exceeded the actual amount that would be paid to the class by a factor of three. *Id.* at 1224.

At the Fairness Hearing, class counsel represented that, as of the close of business on June 5, 2015, 19,469 class members, or approximately 3% of the class, submitted claims. Based on that claims rate, BSH will pay a total of $1,070,795 to class members—assuming all claims are determined to be valid. The amount of requested attorney's fees ($4,188,981.61) is approximately four times the maximum amount that will actually be paid to the class. Thus, the same proportionality concern identified in *Allen* is present here.

The proposed settlement also contains a "clear sailing" provision, whereby BSH agreed not to object to class counsel seeking attorney's fees and costs of $6.5 million or less. *See Newberg* § 13:7 (combination of a claims-made settlement with a clear sailing provision "makes it appear as if class counsel agreed to a low defendant liability in exchange for an easy fee").

Class counsel argue that the settlement does not provide for a reversion of funds to BSH. Although the claims-made settlement does not contain a reverter provision, "[a] claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Newberg* § 13:7 (reversionary fund settlements and claims-made settlements "are fully synonymous").

As the *Allen* court stated, the existence of red flags "does not mean the settlement cannot still be fair, reasonable, or adequate." *Allen*, 787 F.3d at 1224. However, especially in light of

the troubling features of the proposed settlement, the Court has "a special obligat[ion] to assure itself" that the settlement is fair, reasonable, and adequate and "that the fees awarded in the agreement [are] not unreasonably high." *Id.* (internal quotation marks omitted; first alteration in original).

With this special obligation in mind, the Court proceeds to address the adequacy of the settlement.

## IV.   Adequacy of Settlement

The Court assesses the adequacy of the settlement in light of the *Churchill Village* factors. *See Churchill Vill.*, 361 F.3d at 575.

### A.   Strength of Plaintiffs' Case

Most of Plaintiffs' claims survived a motion to dismiss (Plaintiffs' express warranty claims under the Uniform Commercial Code and the Song Beverly Act were dismissed without leave to amend). Classes for four states were certified. BSH's pending summary judgment motion sought to eliminate the claims of a significant subset of the certified classes. BSH also had pending motions to decertify the classes and *Daubert* motions challenging Plaintiffs' experts on damages, defective design, and consumer complaints. These motions presented serious hurdles for Plaintiffs. Additionally, in the *Whirlpool* action, which involved similar claims of front-loading washing machines having a propensity to develop BMFO, a jury trial resulted in a unanimous defense verdict. Although Plaintiffs' claims were strong enough to survive a motion to dismiss, they had many evidentiary weaknesses.

### B.   Risk, Expense, Complexity

Even if Plaintiffs could be certain their claims would survive the pending motions and they would obtain a favorable verdict, defending that verdict on appeal would pose its own set of challenges. This case has already been through a round of appeals, and given the procedural history, further appeals can likely be expected if the case were to proceed in active litigation. The value of any judgment would therefore be discounted by the delay the class members would face in actually obtaining that judgment. By contrast, the proposed settlement provides certain, timely, and substantial relief. *See Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D.

482, 489 (E.D. Cal. 2010) (in weighing the risk of future litigation, "a court may consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation") (internal quotation marks omitted).

### C.    Risk of Maintaining Class Action Status

Maintaining class action status itself was significantly at risk. Even as to the certified classes of consumers in California, Illinois, New York, and Maryland, maintaining certification through trial was not guaranteed in light of BSH's pending decertification motion and the expected appeals of any final class certification order. *Cf. McKenzie v. Fed. Exp. Corp.*, 2012 WL 2930201, at *4 (C.D. Cal. July 2, 2012) (even though class had been certified and defendant's motion for reconsideration of the certification decision had been denied, third *Churchill Village* factor weighed in favor of final approval because "settlement avoids all possible risk").

### D.    Amount Offered in Settlement

The settlement makes all nationwide class members eligible to receive a $55 cash payment. For comparison, Plaintiffs' per-washer damages estimates ranged from $113 to $396, depending on the methodology employed. Plaintiffs' only damages model that BSH conceded could be a valid classwide measure—the price elevation model—estimated damages of $113 per washer. The potential recovery is nearly half of that figure.

Class counsel characterizes the settlement as creating a maximum value of $35.75 million ($55 × 650,000 class members). As discussed above, this "maximum value" is somewhat illusory. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) ("The $14.2 million 'benefit' to the class members was a fiction . . . . Only 30,245 claims were filed, yielding total compensation for the class members of less than $1 million."). A case like this one presents challenges to actually notifying all class members and making sure that they all submit claims. It is patently unrealistic to expect that all—or close to all—class members would submit a claim. *See In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405

(D. Mass. 2008) ("[I]n . . . a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees.").

In fact, at the Fairness Hearing, class counsel represented that only 19,469 class members (or approximately 3% of the nationwide class) submitted claims. Assuming each of these claims are determined valid and paid, the total payout to the class will only be $1,070,795. This economic reality should be taken into account when assessing the adequacy of the settlement. *See Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 267 (E.D.N.Y. 2009) ("[T]he settlement should be valued on the basis of the number of claims that were made against it[.]"); Fed. Jud. Ctr., *Managing Class Action Litigation: A Pocket Guide for Judges* at 13 (3d ed. 2010) (advising courts reviewing settlements to obtain information about "the number of claims actually filed by class members" and "the amount of the settlement that is likely to be distributed to class members"); *see id.* at 16 ("Your appraisal of the settlement should focus on the value actually distributed to the class—based on the number and percentage of class members who have filed a claim."); Nicholas M. Pace & William B. Rubenstein, *How Transparent are Class Action Outcomes? Empirical Research on the Availability of Class Action Claims Data* 39 (RAND Institute for Civil Justice 2008) ("As part of demonstrating the amount accorded to the class, the parties should have to estimate the proportion of class members likely to make claims and the likely average amount of such claims. . . . In short, the numbers should be transparent and they should add up.").

Although only 3% of class members submitted claims, all class members—besides the approximately 30 who opted out—are releasing their claims against BSH. Put another way, the proposed settlement buys a release from approximately 650,000 class members for the price of $1.65 per class member ($55 × 19,469 claims submitted ÷ 650,000 class members). *See Pearson*, 772 F.3d at 783-84 (where class members were eligible to receive up to $12 without proof of purchase and up to $50 with proof of purchase, the actual payment to class members spread across the entire class was "only 7 cents apiece"). Quantifying the settlement as a function of the actual claims is much more meaningful—and accurate—than class counsel's version of the "maximum value" of the settlement ($35.75 million).

Nevertheless, the Court recognizes that the $1.65 figure does not tell the whole story. In the settlement, BSH agreed to pay $55 for all valid claims made. Although competent and experienced counsel for both sides could not have believed all class members would submit claims, *see In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 405 (D. Mass. 2008) (stating "attorneys for each side bargain knowing that" in "a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees"), a claims rate somewhat above 3% was likely a realistic possibility, *see Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) ("'[C]laims made' settlements regularly yield response rates of 10 percent or less."). BSH's agreement up front to be on the hook for all valid claims is worth something greater than simply the value of the actual payment that will be made to class members.

Unlike class counsel, the Court thus cannot call the settlement "an excellent result" for the class. That said, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (internal quotation marks omitted).

### E.    Extent of Discovery Completed and the Stage of Proceedings

The settlement was reached two months before trial was set to commence and only after extensive fact discovery, expert discovery, and motions practice. The first mediation took place after the four classes were certified and after substantial fact and class-related expert discovery. The second mediation took place nine months later, by which time the parties had conducted additional fact discovery, deposed each other's experts, and filed opening and responding briefs to BSH's summary judgment motion. Following the second mediation, the parties resumed active litigation, including trial preparation and ongoing briefing related to summary judgment, BSH's decertification motion, and *Daubert* challenges.

This is certainly a case where both parties had ample time and information to evaluate all aspects of the case, the strength of the factual and legal questions at issue, and the likelihood of prevailing.

### F.    Experience and Views of Counsel

Counsel on both sides of this case are experienced litigators. Class counsel competently investigated and litigated the factual and legal issues raised in this action, and they wholeheartedly endorse the settlement as fair, reasonable, and adequate. *See* Sagafi Decl. ¶¶ 23-24. In light of the problematic incentives inherent in agreements like the one before the Court, however, the views of counsel are not given significant weight.

### G.    Presence of a Governmental Participant

There is no governmental participant in this action.

### H.    Reaction of Members of the Proposed Settlement

All class representatives, who actively participated in this litigation, endorse the settlement. *See* Declaration of Beverly Gibson (Dkt. 372-2); Declaration of Dennis Demereckis (Dkt. 372-3); Declaration of Nancy Wentworth (Dkt. 372-4); Declaration of Trish Isabella (Dkt. 373-5). As of the deadline for objecting to or opting out of the settlement (April 30, 2015), the claims administrator received 30 opt-outs (0.005% of the total class).

The following class members objected to the adequacy of the settlement: Roger Kerr, Robert and Robin Munoz, Jeffrey Rudy, and Bobby Ameen.[2] One objector, for example, called the $55 payment a "miniscule settlement amount . . . in comparison [with] the outlay of funds we were forced to make." Another objector states that "[t]he $55.00 settlement seems ridiculous, and sort of a slap in the face."

The flaw with each of the objections to the adequacy of the settlement is that the objectors consider only the amount of their asserted damages and ignore both the costs and risks of litigation.

### I.    Settlement Procedure

In addition to the factors enumerated in *Churchill Village*, the Court finds it appropriate to consider the procedure by which the parties arrived at the settlement to determine whether

---

[2] Carole Manuwa initially objected to the claims procedure but later withdrew her objection. Charles Moore submitted an objection because he contends that BSH did nothing wrong. Because he does not contend that the settlement is inadequate or unfair to the class, the Court does not address his objection any further.

the settlement is truly the product of arm's length bargaining, rather than the product of collusion or fraud. *See Chun-Hoon*, 716 F. Supp. 2d at 851; *Van Ba Ma v. Covidien Holding, Inc.*, 2014 WL 2472316, at *2 (C.D. Cal. May 30, 2014).

The parties engaged in two mediations with well-respected former judges: the Honorable Daniel S. Pratt (Ret.) and the Honorable Dickran Tevrizian (Ret.). In a declaration in support of final approval of the settlement, Judge Tevrizian stated that "the negotiations were intense, arms-length, non-collusive, and contentious." Tevrizian Decl. ¶ 6.

### J.    Conclusion

In weighing the factors listed above, the Court cannot agree with class counsel's characterization of the settlement as being an "excellent result for the Class." However, particularly in light of the significant risks Plaintiffs would face going forward in the case, the Court finds that the settlement is fair, adequate, and reasonable. *See* Fed. R. Civ. P. 23(e)(2). And, although the settlement contains features that are less than ideal, the Court finds that the settlement "is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *See Rodriguez*, 563 F.3d at 965 (internal quotation marks omitted). Rather, the less than remarkable result reflects the serious obstacles to victory Plaintiffs would have faced if the case proceeded.

## V.    Attorney's Fees

Class counsel seeks to recover attorney's fees of $4,188,981.61.

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Because there is no agreement regarding fees, the Court, sitting in diversity adjudicating state law claims, turns to applicable California law." *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1169 (C.D. Cal. 2010); *see also Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478–79 (9th Cir. 1995) ("The method of calculating a fee is an inherent part of the substantive right to the fee itself, and a state right to an attorneys' fee reflects a substantial policy of the state.").

"Under Cal. Civ. Code § 1780(e), a prevailing plaintiff in an action under the CLRA is entitled to an award of costs and attorneys' fees." *Parkinson*, 796 F. Supp. 2d at 1169. A plaintiff is a "prevailing plaintiff" under the CLRA when, because of a judgment or settlement, "he obtain[s] a net monetary recovery or . . . he achieve[s] most or all of what he wanted by filing the action or a combination of the two." *Kim v. Euromotors W./The Auto Gallery*, 149 Cal. App. 4th 170, 181 (2007). Plaintiffs in this case qualify as "prevailing plaintiff[s]" because of the monetary recovery provided by the settlement.

## A.    Method of Calculating Fees

"Courts recognize two methods for calculating attorney fees in civil class actions: the lodestar/multiplier method and the percentage of recovery method." *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 254 (2001). Courts have discretion to determine which method of calculation to choose. *See, e.g.*, *In re Bluetooth*, 654 F.3d at 940; *In re Consumer Privacy Cases*, 175 Cal. App. 4th 545, 558 (2009) ("It is not an abuse of discretion to choose one method over another as long as the method chosen is applied consistently using percentage figures that accurately reflect the marketplace."). "Regardless of whether attorneys' fees are determined using the lodestar method or awarded based on a 'percentage-of-the-benefit' analysis under the common fund doctrine, [t]he ultimate goal . . . is the award of a 'reasonable' fee to compensate counsel for their efforts, irrespective of the method of calculation." *In re Consumer Privacy Cases*, 175 Cal. App. 4th at 557-58 (internal quotation marks omitted) (alterations in original). Especially in a class action, "the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328-29 (9th Cir. 1999); *accord Staton*, 327 F.3d at 963-64.

The Court briefly discusses the rationale behind the two respective methods of calculation before selecting the appropriate method for this case.

### 1.    Lodestar

"Generally, litigants in the United States pay their own attorneys' fees, regardless of the outcome of the proceedings." *Staton*, 327 F.3d at 965. However, "in certain cases prevailing

parties may recover their attorneys' fees from the opposing side. When a statute provides for such fees, it is termed a 'fee-shifting' statute." *Id.* Under California law, "[i]n so-called 'fee shifting' cases . . . the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method." *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000); *see also Staton*, 327 F.3d at 965 ("Under a fee-shifting statute, the court 'must calculate awards for attorneys' fees using the "lodestar" method' . . . ."); *Apple Computer, Inc. v. Superior Court*, 126 Cal. App. 4th 1253, 1270 (2005) (attorney's fees "under a fee-shifting statute are determined using the lodestar method"). The laws of New York, Maryland, and Illinois are in accord. *See Douyon v. NY Med. Health Care, P.C.*, 49 F. Supp. 3d 328, 340 (E.D.N.Y. 2014) (using lodestar method to calculate fees in case brought under New York's consumer protection statute and the Fair Debt Collection Practices Act); *Hyundai Motor Am. v. Alley*, 960 A.2d 1257, 1265 (2008) ("In determining an award under Maryland fee-shifting statutes, courts employ the lodestar methodology.") *Demitro v. Gen. Motors Acceptance Corp.*, 388 Ill. App. 3d 15, 25 (2009) (affirming award of attorney's fees calculated using lodestar method in case brought under Illinois's Consumer Fraud Act).

"[The lodestar] figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. "Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Lealao*, 82 Cal. App. 4th at 26.

### 2. Percentage of Recovery

Another method of calculating reasonable attorney's fees is the percentage-of-recovery approach, which is based on the common fund doctrine. Under this doctrine, "a private plaintiff, or his attorney, whose efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 769 (9th Cir. 1977). "This rule

. . . is designed to prevent unjust enrichment by distributing the costs of litigation among those who benefit from the efforts of the litigants and their counsel." *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing *Paul, Johnson, Alston, & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989)). "Under regular common fund procedure, the parties settle for the total amount of the common fund and shift the fund to the court's supervision. The plaintiffs' lawyers then apply to the court for a fee award from the fund." *Staton*, 327 F.3d at 969.

In common fund cases, the "benchmark" percentage award is 25 percent of the recovery obtained, with 20 to 30 percent as the usual range. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002). The "benchmark" is the starting point for the analysis, and the ultimate amount must be supported by findings that take into account all of the circumstances of the case, including the result achieved, the risk involved in the litigation, the skill required and quality of work by counsel, the contingent nature of the fee, awards made in similar cases, and the lodestar crosscheck. *Id.* at 1048-50.

There are significant benefits to the percentage approach, including consistency with contingency fee calculations in the private market, aligning the lawyers' interests with achieving the highest award for the class members, and reducing the burden on the courts that a complex lodestar calculation requires. *See In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1374-77 (N.D. Cal. 1989).

### 3.   Selection of Method of Calculation

Class counsel argue that the Court should calculate reasonable attorney's fees using the lodestar method. They spent over 18,000 hours litigating this case and assert a lodestar of $9,265,612.75. In contrast, if the percentage of recovery method is used, the starting point for determining class counsel's reasonable fees would likely be around $300,000 to $400,000.

For three primary reasons, the Court finds it appropriate to calculate reasonable attorney's fees in this case using the lodestar method.

First, Plaintiffs' consumer protection claims are based on fee-shifting statutes. *See In re Bluetooth*, 654 F.3d at 941 ("The 'lodestar method' is appropriate in class actions brought

under fee-shifting statutes . . . ."). California, New York, Illinois, and Maryland—the four

states for which classes were previously certified—all have statutes authorizing or requiring fee

shifting in favor of the prevailing party. *See* Cal. Civ. Code § 1780(e); N.Y. Gen. Bus. Law

§ 349(h); 815 Ill. Comp. Stat. Ann. 505/10a; Md. Code Ann., Com. Law § 13-408.

Second, this is not a common fund case. Unlike in a common fund settlement, whatever

amount of fees is awarded to class counsel, it will not affect the amount going to class

members. *See In re Consumer Privacy Cases*, 175 Cal. App. at 557 ("[A] fee award may not be

justified solely as a percentage of the recovery when that award will not come from the

settlement fund.").

Third, although calculation of the lodestar amount focuses on class counsel's billing

time and billing rate, other factors are considered both in calculating the lodestar and in

determining whether to apply a multiplier (negative or positive). *See Kerr v. Screen Extras

Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975) (listing several factors). Thus, the amount of

recovery to the class will be factored into the determination of class counsel's reasonable fee.

*See Morales v. City of San Rafael*, 96 F.3d 359, 364 (9th Cir. 1996) ("The district court was not

only free but obligated to consider 'the results obtained' by [the plaintiff], or 'the extent of [his]

success,' in calculating the lodestar figure." (internal citation omitted)).

### B.    Calculating Class Counsel's Lodestar

Plaintiffs' exhibits show that class counsel spent more than 18,730 hours in this case. At

the Fairness Hearing, counsel for BSH represented that the amount of time put in by his firm

was "in parallel" with the time spent by class counsel. At the Court's request, class counsel

submitted detailed billing records. From its review of the billing records, the Court finds that, in

general, the time and rates billed by class counsel is reasonable. However, the Court has

identified a number of problems affecting the reasonableness of hours billed and billing rates

for some attorneys/staff.

### 1.    Block Billing

Many of class counsel's time entries "lump[ed] together multiple tasks, making it

impossible to evaluate their reasonableness." *Role Models Am., Inc. v. Brownlee*, 353 F.3d 962,

971 (D.C. Cir. 2004). Such "block billing makes it more difficult to determine how much time was spent on particular activities." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007). The Court exercises its discretion to reduce block-billed time entries by 20%. *See id.* (approving reduction of block-billed time, but disapproving across-the-board reduction when not all hours were block billed). In total, class counsel block-billed 4,736.6 hours, which amount to $1,875,194.17. Cutting these entries by 20% results in a reduction of $375,788.83.

### 2.    Hourly Rate

"In assessing a reasonable hourly rate for the lodestar figure, courts should consider the prevailing market rate in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Rosenfeld v. U.S. Dep't of Justice*, 903 F. Supp. 2d 859, 877 (N.D. Cal. 2012) (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984)). "Generally, when determining a reasonable hourly rate, the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). Class counsel, as the fee applicant, bear the burden of "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*, 465 U.S. at 896 n.11.

The billing rates of the attorneys and staff who worked on this case varied as follows: $490 to $995 per hour for partners; $300 to $800 per hour for associates; and $130 to $425 for paralegals and administrative staff. The Court finds that some of the rates billed by individual attorneys are unreasonably high. In calculating class counsel's lodestar, the Court reduces the billing rate of partner time to a maximum of $800 per hour, associate time to a maximum of $550 per hour, and paralegal time to a maximum of $225 per hour. *See Vinh Nguyen v. Radient Pharm. Corp.*, 2014 WL 1802293, at *11 (C.D. Cal. May 6, 2014) (approving rates up to $750

per hour for partners, $550 per hour for associates, and $225 per hour for paralegals). This adjustment to class counsel's billing rates reduces their asserted lodestar by $290,726.50.

Additionally, in some instances, the stated billing rate was unreasonable in light of the task performed. For example, class counsel billed at a partner's rate of $710 to $950 per hour for tasks such as: "prepare judge's courtesy copies [of court filing]"; "search offsite storage files for Castillo depo transcript"; "scan Castillo Deposition transcript and errata and email to co-counsel"; "arrange interpreter [for deposition]"; "schedule inspections"; "Administration of the case"; and "Administrate bills and expenses." The Court reduces the rate for these and other similar tasks to either an associate or paralegal rate, depending on the task, resulting in a net reduction of $62,333.50 for all such entries.

### 3.    Overly Vague Entries

Many of class counsel's billing entries were so vague as to prevent the Court from assessing the reasonableness of the time and rate billed. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Rosenfeld*, 903 F. Supp. 2d at 876 ("The vagueness of certain documents included in Plaintiff's time records make it difficult for this Court to assess whether the time claimed was reasonably spent on this matter."). Examples of such overly vague entries include: "review docs" (several entries); "email" (1.0 hours); "certificate" (1.0 hours); "brief" (6.0 hours); "Review background materials" (8.0 hours); "Expert work" (several entries including one for 10.0 hours); "Conduct document review and analysis" (several all-day entries totaling nearly 500 hours); and "Read and summarize deposition" (several all-day entries totaling 236 hours). These entries are of particular concern to the Court given the large number of hours spent by class counsel in this case. For example, in light of class counsel's fairly detailed billing entries covering thousands of hours devoted to expert-related work, the Court cannot conclude that the additional dozens of hours vaguely described as "expert work" (or something similar) is reasonable. Giving class counsel the benefit of the doubt on these vague entries, the Court cuts them by 50%, resulting in a total reduction of $206,699.75.

The Court also made reductions where the time spent was unreasonable, a task was unnecessarily overstaffed, or the task is not billable. For example, 36.5 hours were billed to summarizing a single deposition. The Court finds this amount unreasonable and cuts it to 16 hours. This category includes reductions totaling $48,334.50.

### 4.    Billing by the Quarter-Hour

One of the law firms, WeissLaw LLP, billed its time in quarter-hour increments. Although that practice is not unreasonable per se, the Court finds it resulted in time counted for hours not reasonably expended on this litigation. Some—but not all—of WeissLaw's attorneys and staff have several quarter-hour and half-hour entries for tasks, such as reviewing and drafting emails and other correspondence, that likely took only a portion of the time billed. *See Welch*, 480 F.3d at 949 (affirming district court's finding that "hours were inflated because counsel billed a minimum of 15 minutes for numerous phone calls and e-mails that likely took a fraction of the time"). The majority of the billing entries of attorney Joseph H. Weiss and paralegal LaDonna R. McDuffie are quarter-hour or half-hour tasks and the Court reduces their billed time by 20%. *See id.* (affirming across-the-board reduction of hours billed in quarter-hour increments). Attorneys Jordan L. Lurie and Leigh A. Parker also had several such entries—although not a majority—and the Court reduces their billed time by 10%. The Court does not reduce the hours of the other WeissLaw attorneys due to quarter-hour billing. In total, the Court's reduction for quarter-hour billing is $50,549.65.

Based on the Court's review of class counsel's billing records, and making the reductions discussed above, it calculates class counsel's lodestar at $8,498,409.02.

### C.  Adjustment to Lodestar

Having calculated the lodestar, the Court now considers whether to increase or decrease that amount by applying a positive or negative multiplier in light of other factors, particularly the results obtained. *Lealao*, 82 Cal. App. 4th at 26; *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1115-16 (C.D. Cal. 2012) ("Adjustments to this presumptively reasonable amount may then be made based upon the factors set forth in *Kerr v. Screen Extras Guild, Inc.*,

526 F.2d 67, 69-70 (9th Cir. 1975) to the extent that those factors are not reflected in the lodestar calculation.").

"[W]here the plaintiff has achieved 'only limited success,' counting *all* hours expended on the litigation—even those reasonably spent—may produce an 'excessive amount,'" and courts should "instead 'award only that amount of fees that is reasonable in relation to the results obtained.'" *In re Bluetooth*, 654 F.3d at 942 (quoting *Hensley*, 461 U.S. at 436, 440); *see also McCown v. City of Fontana*, 565 F.3d 1097, 1101-02 (9th Cir. 2009) ("The reasonableness of the fee is determined primarily by reference to the level of success achieved by the plaintiff.").One way of taking into account the results achieved is by cross checking the reasonableness of a fee with the percentage of recovery method. *Lealao*, 82 Cal. App. 4th at 50; *see also In re Bluetooth*, 654 F.3d at 944 ("[E]ven though the lodestar method may be a perfectly appropriate method of fee calculation, we have also encouraged courts to guard against an unreasonable result by cross-checking their calculations against a second method.").

Here, the maximum *actual* payment that will be made to class members is $1,070,795, or approximately $1.65 per class member. As discussed above, this result for the class—though not remarkable—is not unreasonable in light of the significant risk of Plaintiffs losing their case altogether. However, in determining the reasonableness of class counsel's fee, the maximum actual payment to the class undermines to a degree the reasonableness of the total amount of time spent by class counsel litigating this case. If this case is truly worth only $1,070,795.00, or approximately $1.65 per class member, is it reasonable for class counsel to have spent over 18,000 hours (amounting to a claimed lodestar of $9,532,841.75)? Probably not. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("[A]ttorneys' fees don't ride an escalator called risk into the financial stratosphere. Some cases should not be brought, because the litigation costs will exceed the stakes, and others are such long shots that prudent counsel will cut his expenditure in litigating them of time, effort, and money to the bone.").

Using the percentage of recovery method as a cross check, it is clear the unadjusted lodestar dwarfs the class's recovery, suggesting a negative multiplier is appropriate. The only question is how much of a negative multiplier.

Here, class counsel's lodestar with no multiplier ($8,498,409.02) is a whopping 7.8 times the maximum amount that will be going to class members $1,090,795.00 (class payment plus incentive awards. *See Pearson*, 772 F.3d at 781 (rejecting the requested fees because they were "an outlandish 69 percent" of the aggregate value). Class counsel—no doubt aware that their lodestar would dwarf the amount of actual recovery to class members—were wise to request a fee amounting to a significant reduction of their lodestar. Class counsel request a fee of $4,188,981.61, or a negative multiplier of approximately 0.5 of the unadjusted lodestar. The requested fees are 3.8 times the amount going to the class.

The Seventh Circuit recently suggested that "in consumer class actions, where the percentage of class members who file claims is often quite low . . . the presumption should . . . be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel." *Pearson*, 772 F.3d at 782 (citation omitted). Although the Ninth Circuit has stated that "the benefit obtained for the class" is "[f]oremost among the[] considerations" relevant to an upward or downward adjustment of the lodestar, *In re Bluetooth*, 654 F.3d at 941-42, it has not set a mandatory not-to-exceed percentage when using the percentage of recovery method as a cross check.

The amount of fees requested by class counsel likely could not be justified under a percentage of recovery calculation. However, "[b]ecause," in a fee-shifting case, "the lodestar award is de-coupled from the class recovery, the lodestar assures counsel undertaking socially beneficial litigation (as legislatively identified by the statutory fee shifting provision) an adequate fee irrespective of the monetary value of the final relief achieved for the class." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995).

The Court believes the requested fee of $4,188,981.61, which is a negative multiplier of approximately 0.5 of the unadjusted lodestar, adequately takes into account the results achieved for the class. In light of the circumstances of this case—which can fairly be described as hotly contested litigation, spanning over five years, including an appeal in the Ninth Circuit and

petition for review in the Supreme Court—as well as the policy underlying fee-shifting statutes, the Court finds the requested amount of attorney's fees ($4,188,981.61) is reasonable.

### D.    Objections to Attorney's Fees

Some of the objectors argue the requested attorney's fees are unreasonable. The thrust of these arguments are that the reasonableness of the fees should be determined by comparison to the actual amount that will be paid to class members (that is, $1,070,795 based on a 3% claims rate), not to the "fictional" figure of $35,750,000 that assumes a 100% claims rate. Objector Bobby Ameen argues the fee is unreasonable if it is more than 40% of the actual payout to the class. As discussed above, the Court agrees with the contention that the actual payout to the class must be considered in determining reasonable attorney's fees. However, comparing the requested fee to the actual payout does not necessarily lead to the conclusion that the requested fee is unreasonable. As discussed above, the Court finds it appropriate to calculate fees using the lodestar method with a percentage of recovery cross check.

The Court thus overrules the objections, and GRANTS the motion as to attorney's fees.

### VI.    Legal Costs

Class counsel also request costs of $2,311,018.39. The vast majority of these expenses was incurred through expert opinions and testimony. The balance of the expenses includes court fees, discovery costs, travel costs, copying costs, mailing costs, and so forth. In light of the length of this litigation, the importance of expert testimony, and the number of experts on both sides (a total of 21), the Court finds these costs reasonably incurred and GRANTS the motion as to costs.

### VII.    Class Representative Award

Class counsel also request an award to the class representatives of $5,000 each (a total of $20,000).

It is common in class action cases to provide incentive awards to named plaintiffs. *See Newberg* § 11:38 (4th ed. 2008).

Over the course of this lengthy litigation, the named plaintiffs each participated in day-long depositions, made their washers available for inspections, participated in day-long

inspections of their homes, and answered discovery. BSH agreed to pay these incentive awards and such payment will not diminish the payment to be made to other class members. The Court finds that the enhancement awards requested in this case are reasonable and appropriate. *See In re Toys R Us-Delaware, Inc —Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 472 (C.D. Cal. 2014) (approving $5,000 incentive award); *Faigman v. AT & T Mobility LLC,* No. C06–04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving incentive payment of $3,333.33 and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable").

The Court therefore GRANTS the request for incentive awards of $5,000 for lead plaintiffs Dennis Demereckis, Beverly Gibson, Trish Isabella, and Nancy Wentworth.

## VIII.  Disposition

The Court GRANTS the Motion for Final Approval (Dkt. 373). The objections to the settlement are overruled.

The Court GRANTS the Motion for Fees (Dkt. 372), and awards class counsel attorney's fees of $4,188,981.61 and reimbursement of costs totaling $2,311,018.39. The objections to class counsel's fees are overruled. The Court approves awards of $5,000 for each of the four lead plaintiffs Dennis Demereckis, Beverly Gibson, Trish Isabella, and Nancy Wentworth.

DATED:  July 27, 2015

_David O. Carter_
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE